[No. A133927. First Dist., Div. Five. Dec. 18, 2013.]

ASAHI KASEI PHARMA CORPORATION, Plaintiff and Appellant, v. ACTELION LTD. et al., Defendants and Appellants.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C.3., II.C.4., II.D., and II.E.

**COUNSEL**

Morgan, Lewis & Bockius, Thomas M. Peterson, Rollin B. Chippey II, Benjamin P. Smith, Christopher J. Banks and Tera M. Heintz for Plaintiff and Appellant.

Mayer Brown, Evan M. Tager, Craig W. Canetti, Lee N. Abrams, Donald M. Falk; Cotchett, Pitre & McCarthy, Joseph W. Cotchett and Nancy L. Fineman for Defendants and Appellants Actelion Ltd., Actelion Pharmaceuticals Ltd., Actelion Pharmaceuticals US, Inc., and Actelion U.S. Holding Company.

Ropers, Majeski, Kohn & Bentley and Susan H. Handelman for Defendants and Appellants Jean-Paul Clozel, Martine Clozel and Simon Buckingham.

## OPINION

**BRUINIERS, J.**—Asahi Kasei Pharma Corporation (Asahi) is a Japanese corporation which develops and markets pharmaceutical products and medical devices. One of its products is Fasudil, a drug which Asahi sought to market in the United States (U.S.) for treatment of pulmonary arterial hypertension (PAH). In order to obtain regulatory approvals for Fasudil, and to develop and commercialize it in North America and Europe, Asahi entered into a licensing and development agreement (the License Agreement) with CoTherix, Inc. (CoTherix), a California-based biopharmaceutical company focused on developing and commercializing products for the treatment of cardiovascular disease. Appellant Actelion Ltd. is a Swiss pharmaceutical company that markets a PAH treatment drug, bosentan (under the trade name Tracleer), and holds the dominant share of the relevant market. Actelion Ltd., through a subsidiary, acquired all of the stock of CoTherix, and concurrently notified Asahi that CoTherix would discontinue development of Fasudil for "business and commercial reasons."

Asahi filed suit in the San Mateo County Superior Court against CoTherix, Actelion Ltd., Actelion Pharmaceuticals Ltd., Actelion Pharmaceuticals US, Inc., and Actelion U.S. Holding Company (collectively Actelion), as well as three Actelion executives.[1] The case went to trial on four of Asahi's claims: intentional interference with the License Agreement; interference with Asahi's prospective economic advantage; breach of a confidentiality agreement between Actelion and CoTherix (on a third party beneficiary theory); and breach of confidence.[2] The jury returned a unanimous liability verdict against Actelion and the Individual Defendants (collectively Defendants), awarding nearly $546.9 million in compensatory damages, and finding that all Defendants acted with malice, oppression or fraud. The jury awarded punitive damages against the Individual Defendants. Posttrial, the court offset the verdicts for the amounts previously awarded to Asahi in an International Chamber of Commerce arbitration proceeding (ICC Arbitration) against CoTherix. Defendants' motions for judgment notwithstanding the verdict

---

[1] These executives are Jean-Paul Clozel (cofounder and chief executive officer), Martine Clozel (cofounder and chief scientific officer), and Simon Buckingham (worldwide director of corporate and business development). For clarity and consistency with their briefing on appeal, these parties are referenced by first name or collectively as the Individual Defendants.

[2] In *Asahi Kasei Pharma Corp. v. CoTherix, Inc.* (2012) 204 Cal.App.4th 1 [138 Cal.Rptr.3d 620] (*Asahi I*), we affirmed the trial court's grant of summary adjudication of Asahi's claims under the Cartwright Act, the California antitrust statute (Bus. & Prof. Code, § 16700 et seq.).

were denied. The trial court denied a motion for new trial on damages, conditioned on Asahi's acceptance of a remittitur of certain damage categories.

Defendants contend, inter alia, that any actions taken to interfere with the License Agreement were privileged and not actionable, and that Asahi's damage claims are speculative and unsupported. The Individual Defendants further challenge the award of punitive damages. Asahi cross-appeals from the conditional new trial order. In the published portion of this opinion we address the scope of liability for tortious interference with a contract by a nonparty to the contract, and we affirm the judgment in favor of Asahi. In the nonpublished portion of our decision we reject the challenges of Actelion and the Individual Defendants to the trial court's evidentiary rulings and to the damage awards, and we deny Asahi's cross-appeal.

## I. BACKGROUND AND PROCEDURAL HISTORY

While many of the underlying facts were vigorously disputed at trial (and in the briefing on this appeal), we focus on the evidence and inferences supporting the judgment. (*Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 443 [140 Cal.Rptr.3d 206] [we imply "all necessary findings supported by substantial evidence" and " 'construe any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance' "].)[3]

Fasudil was originally formulated in 1984 for intravenous use in treatment of cerebral vasospasm after subarachnoid hemorrhage, a type of stroke, and received regulatory approval in Japan for this use in 1995. Asahi later secured approval in China. Fasudil is protected by a "composition of matter" patent covering the molecule until 2016, and by a formulation patent until 2019.

In 1997, new research showed Fasudil could inhibit a human body protein known as Rho-kinase, which contributes to constriction of smooth muscle in arterial blood vessels. Studies found inhibition of Rho-kinase could slow or even reverse cellular changes associated with certain diseases. One such disease is PAH, a chronic, progressive and often fatal disease that is characterized by severe constriction and obstruction of the pulmonary arteries. Studies indicated that Fasudil had the potential to promote healing of blood vessel lesions and limit the scarring associated with PAH.

---

[3] Defendants do not directly argue that the jury's determination of tortious interference is unsupported by substantial evidence. We would in any event agree with Asahi that such an argument would be forfeited due to Actelion's failure to present a full and fair summary of the evidence supporting the judgment. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 739 [69 Cal.Rptr.3d 365].)

Development of Fasudil for new medical uses was commercially attractive to Asahi if it could be done expeditiously. To recoup investment, a drug must be developed sufficiently early in its patent life to ensure an adequate period of market exclusivity after receipt of regulatory approval and before generic competition arrives.

In order to gain regulatory approvals necessary for new medical uses of Fasudil, Asahi entered into the License Agreement with CoTherix on June 23, 2006. CoTherix had previously obtained regulatory approval for its own inhaled PAH treatment drug, Ventavis. Under the terms of the License Agreement, CoTherix agreed to obtain U.S. and European regulatory approvals for Fasudil to treat certain diseases, and to develop and commercialize it in those markets. CoTherix was to develop oral and inhaled formulations of Fasudil for treatment of PAH, and an oral formulation of Fasudil for treatment of stable angina (SA). It was required to use commercially reasonable efforts to develop Fasudil, and to obtain U.S. regulatory approvals for Fasudil as soon as reasonably practicable. (*Asahi I, supra*, 204 Cal.App.4th at p. 4.) Pursuant to the License Agreement, CoTherix prepared a development plan projecting that it would complete development and file for regulatory approval of extended release oral Fasudil (ER Fasudil) for treatment of SA in 2009, ER Fasudil for treatment of PAH in 2010, and inhaled Fasudil for treatment of PAH in 2011. Asahi considered CoTherix's ability to move quickly in clinical development of Fasudil to be particularly important to preservation of Fasudil's market exclusivity before facing generic competition.

Actelion Ltd. has, since December 2001, marketed Tracleer, an endothelin receptor antagonist and oral PAH drug that has been approved by the Food and Drug Administration (FDA) for use in the U.S.[4] Tracleer is what is known in the pharmaceutical industry as a "blockbuster" drug, generating over $1 billion in revenue annually, and Actelion has held the dominant share of the relevant market. In 2006, 98 percent of Actelion's U.S. revenues were dependent upon Tracleer sales. (*Asahi I, supra*, 204 Cal.App.4th at p. 5.)

At trial, Asahi presented evidence that Actelion acquired CoTherix specifically because it saw Fasudil as a significant threat to its market dominance with Tracleer and that Defendants used unlawful means to stop the development of Fasudil, thereby interfering with the License Agreement. Specifically, Asahi argued that Defendants used extortion and fraud to "painstakingly kill[]" Fasudil as a competitive product.

Actelion had been following Ventavis since 2002 and had considered acquiring CoTherix to get rights to the drug, but as late as May 29, 2006,

---

[4] Martine discovered bosentan (Tracleer) in 1990, while employed by the pharmaceutical company Hoffman-LaRoche.

considered the company a second-rate opportunity because of Ventavis's shortcomings. Shortly after the June 28, 2006 public announcement of the License Agreement, Martine noted Fasudil's promise and the company began to explore the option of acquiring CoTherix. In July 2006, a director of business development for Actelion Pharmaceuticals Ltd., Carina Spaans, referenced CoTherix, Fasudil and another company in her notes, with the following comment: "Buying both companies will leave the market for Tracleer free for Actelion." Negotiation of an acquisition of CoTherix began in August. Martine personally conducted due diligence on Fasudil in early October. Ultimately, Martine recommended returning Fasudil to Asahi, after noting "potential pricing issues if [F]asudil was also working in PAH." "[F]rom the beginning, Martine was of the opinion that [Actelion] would not go ahead with Fasudil." Martine's conclusions were shared with Jean-Paul. Meanwhile, in late October, the results of CoTherix's phase I study were promising. The plan was to move ahead with the phase II clinical study in early 2007. CoTherix had ordered supplies of ER Fasudil for phase II clinical use. On November 19, 2006, Actelion U.S. Holding Company and CoTherix signed an agreement and plan of merger, which was publicly announced the following day.

Beginning November 20, 2006, Asahi repeatedly sought assurances from CoTherix and Actelion that Fasudil development would continue after the proposed merger. These requests for assurances were forwarded to Simon and Jean-Paul. By November 23, Jean-Paul had decided, with input from Martine and Simon, that Actelion was not interested in pursuing development of Fasudil. Actelion drafted a letter to Asahi as early as October 31, stating it would not develop Fasudil, but decided not to send the letter as "part of a strategy." Instead, Actelion "decided to let any correspondence go through [CoTherix President] Don Santel—but to state that no decision has been made." Despite Actelion's knowledge that failure to provide assurances might constitute material breach of the License Agreement, no assurances were provided. In mid-December, Asahi requested a videoconference with Actelion. Although Simon was aware of the prior decision and believed the videoconference "may be a bit of a waste of time," he and Martine participated on December 20, and did not disclose that a decision had already been made. Instead, Simon told Asahi "it was a very productive meeting for Actelion to [help] make their decision to pursue [F]asudil after the completion of [the] merger. . . . Actelion does not have an intention to make any delay of [F]asudil development." On January 3, 2007, CoTherix, after conferring with Actelion, told Asahi: "[W]e continue to honor our agreement to move [F]asudil forward. Please note that I have no power to compel Actelion to provide you with the response you desire."

On January 4, 2007, Simon wrote to a colleague: "[P]lease follow up with Asahi later next week . . . . If things go according to plan we should have

90%+ of shares by Monday evening. [¶] Since we will issue a press release the next day, I think you should probably call [Asahi] to explain our position. Then follow up with the letter that you drafted. I double-checked with [Jean-Paul] today and he definitely agrees we should give Fasudil back to them. We should use the 'portfolio priorities' reason . . . . If they get silly and want to discuss penalties, etc., we could discuss risk-benefit ratio and the need to discuss several issues with the FDA before proceeding!" The next day, Simon told Asahi: "If and when we can be more certain that the proposed transaction will close, we will contact you again regarding Fasudil. We expect that we will know more next week. Until then, CoTherix has assured us that the Fasudil programme is proceeding as planned." On January 9, Actelion acquired all of the stock of CoTherix and concurrently notified Asahi that it was discontinuing development of Fasudil for "business and commercial reasons."

Attempts to negotiate a termination agreement were unsuccessful. On March 6, 2007, Asahi notified CoTherix that, by failing to confirm and commit in writing 30 days prior to the change of control that Actelion would not interfere with CoTherix's obligations, it was in material breach of the License Agreement. Recognizing that Asahi was "resigned to the fact that it is probably all over for [Fasudil] ex-Japan," Simon suggested that Jean-Paul might need to communicate directly with Asahi's president.

Ultimately, on March 23, 2007, Jean-Paul wrote: "As you are aware, [b]usiness executives at Actelion (on behalf of CoTherix) and Asahi have discussed the termination conditions for the [License Agreement] several times over the last few months and we have reached a point of dispute regarding the payment for product supplies. . . . [¶] . . . [¶] . . . [W]e have serious concerns over the long-term safety (in particular renal safety) with chronic [Fasudil] dosing. Actelion feels that this risk/benefit ratio issue is sufficiently serious for us to consider the need to inactivate or even withdraw the U.S. IND[5] and inform the Japanese authorities. [¶] In addition, for public disclosure reasons, since the amount you have requested is very high, in case we would really pay it, we would be obliged to announce this payment and the reasons why we decided to discontinue the development of [F]asudil." Asahi viewed these as threats. An Actelion witness testified that these were tactics discussed and "employed in the hopes that it would speed up negotiations."

On April 3, 2007, Asahi sent notice of the termination of the License Agreement. Jean-Paul later wrote to Asahi's president: "Since Asahi is now

---

[5] An IND is an "Investigational New Drug Application" submitted to the FDA to obtain approval for human clinical testing. (21 C.F.R. § 312.1 et seq. (2013).) An IND for Fasudil had been approved by the FDA.

ready to receive the IND, Actelion personnel will be appointed, on behalf of CoTherix, to supervise the transfer . . . . We shall inform the FDA of our decision to stop development . . . together with the reason for this decision. . . . [¶] . . . [¶] Actelion is preparing an upcoming Press Release to disclose that [F]asudil will no longer form part of the Actelion pipeline and explain the rationale for our decision . . . ."

Thereafter, on April 18, 2007, Actelion filed a clinical study report with the FDA, for the phase I study of ER Fasudil. The report concluded: "[O]verall, [F]asudil ER was well tolerated, the changes in the clinical safety assessments were not clinically significant, and all subjects completed the study." On April 19, 2007, Actelion issued a press release stating only: "After careful review, Actelion has decided not to pursue further development with [F]asudil. Accordingly, the related agreement with [Asahi] had been terminated."

*The Litigation Below*

Asahi first initiated the ICC Arbitration proceeding, against CoTherix only, claiming breach of contract. Among other damages, Asahi claimed the value of development work CoTherix failed to perform through June 2009 and development-based milestone payments. On December 15, 2009, the arbitrators awarded Asahi over $91 million.[6]

Asahi filed the instant litigation on November 19, 2008, naming CoTherix and the Actelion entities. The Individual Defendants were added by Doe amendments to a first amended complaint in June 2009. The operative third amended complaint was filed on October 23, 2009. The complaint set forth eight claims: intentional interference with contract (Claim 1); interference with prospective economic advantage (Claim 2); breach of a confidentiality agreement[7] (Claim 3); in the alternative to Claims 1 and 2, breach of the License Agreement (Claim 4); conspiracy in restraint of trade pursuant to the Cartwright Act (Claim 5); false advertising pursuant to Business and Professions Code section 17500 et seq. (Claim 6); unfair competition pursuant to Business and Professions Code section 17200 et seq. (Claim 7); and breach of confidence[8] (Claim 8).

---

[6] CoTherix paid the award in full shortly thereafter.

[7] In connection with the acquisition of CoTherix, Actelion and CoTherix entered into an agreement to keep confidential the proprietary information of CoTherix and of any third party who provided the information to CoTherix under a confidentiality agreement.

[8] Asahi alleged that Defendants obtained confidential/proprietary information about Fasudil during their CoTherix due diligence, and misused this information by disparaging Fasudil and extorting Asahi.

## Pretrial Motions

Asahi moved for summary adjudication of several of the affirmative defenses asserted by Actelion. The trial court also granted Asahi's motion for summary adjudication of the "manager's privilege" asserted by Actelion and by the Individual Defendants. Additionally, the court granted Asahi's motion for summary adjudication of Actelion's claim of limitation of damage liability under terms of the License Agreement precluding "special, exemplary, consequential or punitive damages," finding those terms unenforceable under either Japanese or California law with respect to intentional or grossly negligent conduct.

Defendants moved to summarily adjudicate Claim 1. The motion was denied.[9]

## The Trial

In January 2011, the matter proceeded to jury trial against the Defendants on Claim 1 (intentional interference with the License Agreement), Claim 2 (wrongful interference with Asahi's prospective economic advantage in the "continued development of Fasudil"), Claim 3 (breach of a confidentiality agreement between Actelion and CoTherix on a third party beneficiary theory), and Claim 8 (breach of confidence). On April 29, the jury returned a unanimous liability verdict against the Defendants, awarding $358.95 million for lost M&R (milestone and royalty) payments; $187.4 million for lost development costs; $450,000 for regulatory maintenance costs; and $75,000 for the cost of an investigator-sponsored study. The compensatory damage award on Claim 1 totaled $546,875,000. No damages were awarded on Claim 2, and only nominal damages were awarded on Claims 3 and 8. The jury also unanimously found the Defendants acted with "malice, oppression or fraud."

In the punitive damage phase of trial, the jury awarded damages against the Individual Defendants only: Jean-Paul, $19.9 million; Martine, $8.9 million; and Simon, $1.2 million. Judgment was entered on the verdicts on Claims 1, 3, and 8 on August 18, 2011.[10]

---

[9] The trial court granted summary adjudication as to Claim 2, limiting its scope to exclude any claims for prospective economic relationships with third parties. Claims 5 and 7 were disposed of by summary adjudication, and Claim 6 was voluntarily dismissed. Claim 4, pled in the alternative to Claims 1 and 2, apparently was not pursued at trial. No claims against CoTherix remained by the time the case went to trial.

[10] The court did not enter judgment on the claims on which no damages were awarded—Claim 2 and the punitive damage claim against Actelion. (See *Costerisan v. Melendy* (1967) 255

## Posttrial Motions

The court granted Defendants' motion to offset the damages award by the amount Asahi recovered from CoTherix in the ICC Arbitration. The court reduced the $358.95 million in M&R damages by $1 million, and the $187.4 million damage verdict for development costs by $69.35 million. Actelion then filed a motion for new trial and/or remittitur and a motion for judgment notwithstanding the verdict. The Individual Defendants filed separate new trial and judgment notwithstanding the verdict motions that joined in the Actelion motions and also challenged the awards of punitive damages. Asahi moved for a new trial on punitive damages as to the Actelion entities.

The court conditionally granted the Defendants' motions for new trial, limited to the issue of compensatory damages for Claim 1, on the basis that the damages were excessive because they included duplicative damages for both lost profits and development costs. The court alternatively denied the motions, conditioned on Asahi's acceptance of a remittitur of development cost damages on Claim 1 to the amount of $18.85 million (plus prejudgment interest). The court otherwise found the amount of damages awarded for lost M&R payments to be "proper, fair, reasonable, appropriate, and supported by the weight of the evidence." The court rejected the arguments based on alleged juror misconduct, striking juror declarations submitted by Defendants. In all other respects, the motions for new trial and judgment notwithstanding the verdict were denied, as was Asahi's motion for new trial.

Asahi accepted the remittitur. The court consequently entered an order denying the motion for new trial. The combined effect of the earlier ordered offset and the remittitur resulted in a reduction of the compensatory damages on Claim 1 to the amount of $377,325,000. An amended final judgment reflecting the reductions and inclusive of costs was entered on November 18, 2011.

*The Appeals*

Defendants filed timely notices of appeal on December 2, 2011. Asahi filed its notice of cross-appeal on December 12, 2011. Actelion contends that, as a matter of law, it cannot be liable for interference with the License Agreement; that the damages awarded are inherently uncertain and speculative; and that multiple evidentiary and instructional errors mandate a new trial. The Individual Defendants join in Actelion's argument that liability for interference with contract is precluded as a matter of law, and specifically argue it

Cal.App.2d 57, 59–61 [62 Cal.Rptr. 800] [in action for damages where jury is properly instructed on nominal damages, liability judgment will not be entered where jury awarded no damages].)

was precluded as to them. They also argue that the punitive damages awarded are excessive, and that there is insufficient evidence to support imposition of punitive damages in any event. Asahi, on cross-appeal, argues that the trial court erred in remitting damages and that it is entitled to a new punitive damage trial against Actelion.

## II. DISCUSSION

### A. *Tortious Interference with the License Agreement*

■ "To recover in tort for intentional interference with the performance of a contract, a plaintiff must prove: (1) a valid contract between plaintiff and another party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citation.] In this way, the 'expectation that the parties will honor the terms of the contract is protected against officious intermeddlers.' [Citation.]" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514, fn. 5 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied Equipment*).)

Citing *Applied Equipment*, Actelion contends that it cannot be liable for tortious interference with the License Agreement because "[t]he tort duty not to interfere with [a] contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Applied Equipment, supra*, 7 Cal.4th at p. 514.) Specifically, they argue: "As a matter of law, [the underlying policy of the tort of intentional interference with contract—preventing outsiders who have no legitimate social or economic interest in the contract from interfering with the expectations of contracting parties—]precludes imposition of liability against Actelion for terminating development of [F]asudil, because that act took place after consummation of the [a]cquisition [of CoTherix], at which time Actelion was not a stranger to CoTheri[x]'s agreement with Asahi." The Individual Defendants join in this argument and maintain: "By the same token, the [I]ndividual [D]efendants—as high-level executives of Actelion—were not strangers to the [License] Agreement, but instead were responsible for determining how Actelion, standing in the shoes of CoTherix, would deal with that agreement."

Asahi counters that California law nevertheless recognizes that corporate owners, officers and directors may be liable for interfering with corporate contracts, and that claims of privilege or justification are defenses that must be pleaded and proved. And to prevail on such defenses, Defendants must

show that they did not "use improper means." (See *Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344, 351, fn. 7, 353, fn. 8 [28 Cal.Rptr.3d 463] (*Woods*).)

### 1. *Jury Instructions on Wrongful Interference with the License Agreement*

The jury was instructed on the elements of a cause of action for wrongful interference with contract. The court declined to give a special jury instruction, proposed by Actelion, that would have directed that the jury could not hold Actelion liable for inducing CoTherix to breach the License Agreement after the acquisition on January 9, 2007, because at that time Actelion had a direct interest in the contractual relationship between CoTherix and Asahi.

In refusing the proposed instruction, on Asahi's objection, the trial court explained: "That's what you're going to argue. You want to argue that they became an affiliate, therefore, they became a party to the contract. That's argument. And that's argument specific as to the facts. [¶] . . . [¶] The issue of law that pertains is a party cannot be held liable for interfering with their own contract. That's the law and that is something that I would be receptive [to] that is a neutral presentation." Actelion's counsel responded: "[T]he only thing that I would ask to add to that is the law also says that a party cannot be liable for interference with its own contract or a contract of one of its affiliates." The court refused the request, stating: "[Y]ou have no case that says that."[11]

Accordingly, the jury was instructed: "A person cannot be liable for interference with that person's own contract, if that person was a party to the contract at the time of the interference." And the trial court instructed the jury on the justification defense: "In certain situations, a particular Defendant may be justified to interfere with or disrupt the contract between Asahi and CoTherix. In those situations, the law will not hold the particular Defendant liable for his/her/its actions even though Asahi suffered damages as a result of the particular Defendant's interference. [¶] It is not Asahi's obligation in this case to prove that the particular Defendant's conduct was unjustified. Instead, the particular Defendant has the burden of proving to you that his/her/its conduct was justified under the circumstances. [¶] . . . [¶] . . . [Y]ou must

---

[11] After the verdict, Defendants continued to insist, by motion for judgment notwithstanding the verdict, that they were not liable as a matter of law for any interference occurring after the acquisition. During argument on the motions, Actelion's trial counsel acknowledged: "I'm not saying we have a case in California that's directly on point. What I'm saying is that the totality of [the case law] create[s] a premise, if you will, that this kind of liability can't exist. . . . *Applied Equipment* cautions against expanding this tort too much." The trial court denied the motion for judgment notwithstanding the verdict.

decide whether a particular Defendant's conduct was justified. If you find that a particular Defendant's conduct was justified, then you cannot find that the particular Defendant intentionally interfered with the [License Agreement]. [¶] In making this decision you must, as a general matter, balance the importance of the objective that the particular Defendant sought to achieve by the interference against the importance of Asahi's interest with which the particular Defendant interfered. You must keep in mind both the nature of the particular Defendant's conduct and the relationship of all the parties involved. [¶] *The affirmative defense of justification does not apply if the particular Defendant used unlawful means to interfere with the [License Agreement]. 'Unlawful means' includes intentional misrepresentation, concealment, and extortion.* [¶] . . . [¶] In evaluating whether a particular Defendant's interference was justified, you should consider all of the circumstances, including but not limited to the following factors: [¶] 1. The nature of the particular Defendant's conduct; [¶] 2. The particular Defendant's motive; [¶] 3. The interests of Asahi with which the particular Defendant's conduct interfered; [¶] 4. The interests sought to be advanced by the particular Defendant; [¶] 5. The social interests in protecting the freedom of action of the particular Defendant and the contractual interests of Asahi; [¶] 6. The proximity or remoteness of the particular Defendant's conduct to the interference; and [¶] 7. The relations among Asahi, CoTherix, and the particular Defendant." (Italics added.)

Thus, the jury was instructed that a defendant was not liable for intentional interference with contract if that defendant's conduct was justified, but that "[t]he affirmative defense of justification does not apply if the particular Defendant used unlawful means to interfere with the [License Agreement] . . . . 'Unlawful means' includes intentional misrepresentation, concealment, and extortion."[12] Having been so instructed, the jury nonetheless found that all Defendants intentionally interfered with the License Agreement.

### 2. *Standard of Review*

We independently review Defendants' legal challenge to the scope of potential liability for the tort of intentional interference with contract. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

### 3. *Analysis*

 Defendants contend that, after January 9, 2007, they could not be liable for interfering with the License Agreement because "Actelion had a

---

[12] The jury was also instructed on intentional misrepresentation, concealment, and extortion.

'legitimate . . . economic interest in the contractual relationship.' " Similar language is found in *Applied Equipment, supra*, 7 Cal.4th 503, in which the California Supreme Court held that *a contracting party* cannot be held liable in tort for conspiracy to interfere with its own contract. (*Id.* at pp. 507–508.) The court noted that a line of authority from the Court of Appeal had held that "one contracting party, by use of a conspiracy theory, could impose liability on another for the tort of interference with contract." (*Id.* at p. 510.) However, the Supreme Court rejected this authority "because: (1) it illogically expands the doctrine of civil conspiracy by imposing tort liability for an alleged wrong—interference with a contract—that the purported tortfeasor is legally incapable of committing; and (2) it obliterates vital and established distinctions between contract and tort theories of liability by effectively allowing the recovery of tort damages for an ordinary breach of contract. . . . [¶] . . . [¶] By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Id.* at pp. 510–511.) The *Applied Equipment* court pointed out that "Applied's conspiracy theory is fundamentally irreconcilable with the law of conspiracy and the tort of interference with contract . . ." because "the tort cause of action for interference with contract does not lie against a party to the contract." (*Id.* at p. 514.) It further stated: "California recognizes a cause of action against *noncontracting parties* who interfere with the performance of a contract. 'It has long been held that a *stranger to a contract* may be liable in tort for intentionally interfering with the performance of the contract.' [Citation.] [¶] . . . [¶] . . . *The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.*" (*Id.* at pp. 513–514, final italics added & fn. omitted.)

Defendants do not contend that they were parties to the License Agreement after January 9, 2007. In fact, Actelion admitted in its trial court pleadings that "no contract exist[ed]" between it and Asahi and that Actelion "did not assume the contract between [Asahi] and CoTherix." Instead, Actelion contends that *Applied Equipment* should be read broadly so as to limit liability for intentional interference to complete "strangers" to the contract, not simply nonparties to the contract. Thus, it contends that the fact that there was never any contract between it and Asahi, and that it did not assume the contract between CoTherix and Asahi, is not determinative. It concedes that, after the acquisition, it was merely a parent who "directed its *wholly-owned* subsidiary [CoTherix] to stop performing a contract." However, it contends that the only

remedy for such an act is breach of contract—a remedy which Asahi has been already afforded against CoTherix in the ICC Arbitration.[13]

■ Defendants urge this court to take the *Applied Equipment* court's language regarding "outsiders who have no legitimate social or economic interest in the contractual relationship" out of context and read it to mean a noncontracting party who also has no interest in the contract. (*Applied Equipment, supra,* 7 Cal.4th at p. 514, italics omitted.) But the California courts have not recognized a corporate owner's absolute privilege to interfere with its subsidiary's contract. (*Woods, supra,* 129 Cal.App.4th at pp. 353, 355; *Collins v. Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 883 [306 P.2d 783] [whether corporation owners are "privileged to cause the corporation to discontinue its relations with plaintiffs, in the belief that such a course of action was in the best interests of the corporation, is a matter of defense, to be decided by a resolution of the factual issues presumptively involved"]; *Sade Shoe Co. v. Oschin & Snyder* (1984) 162 Cal.App.3d 1174, 1181 [209 Cal.Rptr. 124] [an actor with " 'a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor [¶] (a) does not employ improper means, and [¶] (b) acts to protect his interest from being prejudiced by the relation' "]; *Culcal Stylco, Inc. v. Vornado, Inc.* (1972) 26 Cal.App.3d 879, 882–883 [103 Cal.Rptr. 419] [being a parent corporation of a subsidiary business does not, "without more," make "intentional interference with a contract of the business privileged as a matter of law—that is, privileged 'under all conceivable circumstances' "]; *Kozlowsky v. Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 600 [86 Cal.Rptr. 52] [court could not "say, as a matter of law, that, by virtue of Caspers' position as majority stockholder and

---

[13] Defendants also rely on this court's opinion in *Asahi I, supra,* 204 Cal.App.4th 1. They contend: "*Asahi I* establishes that after Actelion acquired CoTherix it was not a stranger to the License Agreement with Asahi, but instead shared 'an inherent unity of economic interest and purpose' with CoTherix . . . . *Asahi I* further establishes that Actelion could not be liable for interfering with the License Agreement in the weeks preceding the Acquisition, because it was the termination of the development of [F]asudil after the Acquisition that gave rise to the damages that Asahi was awarded and 'Asahi fails to suggest how it could have successfully enjoined the merger.' " In *Asahi I,* this court held that, when a company lawfully acquires a competitor, the activities of the two companies in anticipation of the merger cannot constitute a conspiracy in restraint of trade under California's antitrust statutes. (*Id.* at pp. 3–4.) This holding is not relevant to the claims raised on the current appeal. Opinions are not authority for propositions not considered. (*People v. Avila* (2006) 38 Cal.4th 491, 566 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) And, contrary to Actelion's suggestion, *Asahi I* is certainly not law of the case as to whether Actelion can be liable for tortious interference with contract. (*Moore v. Trott* (1912) 162 Cal. 268, 273 [122 P. 462] [doctrine of law of the case does not embrace "points of law not presented and determined"]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309 [126 Cal.Rptr.2d 516] [doctrine of law of the case "does not apply to points of law that might have been determined, but were not decided in the prior appeal"].)

director, his interference with the business relationships of the Bank would be, under all conceivable circumstances, privileged"].)

In *Woods, supra,* 129 Cal.App.4th 344, two employees of a joint venture (Fox Family) sued Fox Family's majority shareholder for interference with a stock option contract the employees had with Fox Family. The defendant demurred on the basis that it was not a stranger to the contract, in light of its majority stake. The trial court agreed, but Division Eight of the Second District Court of Appeal reversed. (*Id.* at pp. 347–349.)

The *Woods* court noted that *Applied Equipment* involved a party to the contract and "the court's analysis never considered the immunity of someone who was not a party to the contract." (*Woods, supra,* 129 Cal.App.4th at p. 352.) Thus, it rejected the notion that *Applied Equipment* stood for the proposition that "an ownership interest in a business entity's contract confers immunity from tort liability for interfering with the entity's contracts . . ." and that *Applied Equipment* "can be stretched so far that it now protects a defendant who has no more than an economic interest or connection to the plaintiff's contract with some other entity." (*Id.* at p. 355.) The court concluded that the *Applied Equipment* definition of "stranger" was "dicta at best." (*Id.* at p. 352.) It further concluded: "[W]e find it highly unlikely that *Applied Equipment* intended to hold, or should be construed as holding, that persons or entities with an ownership interest in a corporation are automatically immune from liability for interfering with their corporation's contractual obligations. [Citation.]" (*Id.* at p. 353.)

The *Woods* court also explained, in a footnote, that although the defendant was not immune, it could assert a privilege against liability for interference with contract. It explained: "The existence of that privilege depends on whether the defendant used improper means and acted to protect the best interests of his own company. [Citation.] It is a qualified privilege that turns on the defendant's state of mind, the circumstances of the case, and the defendant's immediate purpose when inducing a breach of contract. [Citation.]" (*Woods, supra,* 129 Cal.App.4th at p. 351, fn. 7.) However, because the privilege is a defense, it was not amenable to determination on demurrer. (*Ibid.*) The court summarized: "[S]ince long before *Applied Equipment* was decided, our courts have allowed contract interference claims to be stated against owners, officers, and directors of the company whose contract was the subject of the litigation. While those defendants may attempt to prove that their conduct was privileged or justified, that is a defense which must be pleaded and proved." (*Woods, supra,* 129 Cal.App.4th at p. 356.)

We agree with the *Woods* court that "[a] stranger," as used in *Applied Equipment,* means one who is not a party to the contract or an agent of a

party to the contract. (*Woods, supra,* 129 Cal.App.4th at p. 353; accord, *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1604 [92 Cal.Rptr.3d 422] (*Mintz*) ["settled that 'corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract' "].) Under *Woods,* Actelion, by virtue of its ownership interest, is not automatically immune from liability for tortious interference with the License Agreement. (*Woods,* at pp. 353, 355.)

Defendants misplace their reliance on *Mintz, supra,* 172 Cal.App.4th 1594. In *Mintz,* CalPERS (California Public Employees' Retirement System) contracted to provide health insurance to Mintz. Blue Cross contracted with CalPERS to serve as the claims administrator for the plan. Mintz sued Blue Cross for tortious interference with the contract between himself and CalPERS. The trial court sustained Blue Cross's demurrer, and Division Eight of the Second District Court of Appeal affirmed. (*Id.* at pp. 1598–1603.) The court found that Blue Cross was "an agent for CalPERS in administering the contract of insurance." (*Id.* at p. 1603.) It also concluded that a "representative of a contracting party may not be held liable for the tort of interfering with its principal's contract . . . ." (*Id.* at p. 1607.) The *Mintz* court distinguished *Woods* by saying: "*Woods* pointed out that in *Applied Equipment* and all the decisions it cited, 'it was clear that the defendant was either a contracting party *or its agent* who could not be liable for interference' rather than 'noncontracting parties who had some general economic interest or other stake in the contract.' [Citation.] In short, *Woods* merely concludes that a shareholder is not automatically immune from liability for interfering with the contractual obligations of the company in which it holds shares [citation]; *Woods* does not stand for the proposition that the agent of a contracting party may be liable for interference with its principal's contract." (*Id.* at p. 1604, fn. 3.)

*Mintz* is distinguishable from this case in that the party charged with interference was specifically authorized to act as agent of a party to the contract. (*Mintz, supra,* 172 Cal.App.4th at p. 1603.) Defendants point to no evidence in the record establishing that Actelion was authorized to act as CoTherix's agent with respect to the License Agreement.

Nor are we persuaded by Defendants' reliance on *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242 [45 Cal.Rptr.2d 90] (*Kasparian*). In that case, the plaintiff, a limited partner of a partnership, sued the general partnership, two of the individual partners, and a Los Angeles County supervisor for interfering in settlement negotiations in which the plaintiff hoped the general partnership would buy out his interest. The plaintiff obtained a judgment against the partnership and two individual partners for conspiracy to intentionally interfere with his prospective economic advantage.

(*Id.* at pp. 248, 249, 251, 258.) The *Kasparian* court followed *Applied Equipment* and extended its holding to the tort of interference with prospective economic relations. The court concluded that the partnership could not be held liable, as a matter of law, for such a tort because "[i]t can only be asserted against a stranger to the relationship." (*Kasparian*, at p. 262, italics omitted; see *id.* at pp. 248, 266.) However, without any discussion, the court also included the individual partner defendants within that holding. (*Id.* at pp. 262, 266.) To the extent *Kasparian* implicitly holds that the owners of a business entity are automatically deemed to be exempt from interference liability because their economic interest means they are not "strangers," we disagree. Instead, we agree with the *Woods* court that the *Kasparian* court's absence of analysis limits the persuasiveness of its holding. (*Woods, supra,* 129 Cal.App.4th at p. 354.)[14]

■ We hold that the jury was properly instructed on the elements of wrongful interference with contract and properly charged with considering whether Defendants "used unlawful means to interfere with the [License Agreement]." So instructed, the jury found that each of the Defendants intentionally interfered with the License Agreement. The trial court did not err in refusing Defendants' proposed special jury instruction or in denying Defendants' motion for judgment notwithstanding the verdict.[15]

[14] The Individual Defendants point us to *PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55 [64 Cal.Rptr.3d 227] (*PM Group*). In *PM Group*, Division Three of the Second District held that certain noncontracting parties were not strangers to the contract when their performance was necessary to the plaintiffs' prospective economic relationship. A plaintiff concert promoter (Pollack) had attempted to contract with Rod Stewart for a concert tour. Pollack also entered into subcontracts with third party subpromoters. But Stewart never signed a final contract with Pollack. Pollack then sued Stewart and Stewart's manager, lawyer, and agent for tortious interference with the subcontracts. (*Id.* at pp. 57–61.) Because the subcontracts provided for Rod Stewart's concert performance, the court concluded: "as a matter of law, Stewart and his agents could not have interfered with the performance of these subcontracts. The tort of intentional interference with contractual relations is committed only by 'strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.' (*Applied Equipment*[, *supra*, 7 Cal.4th at p.] 514 . . . .) Consequently, a contracting party is incapable of interfering with the performance of his or her own contract and cannot be held liable in tort for conspiracy to interfere with his or her own contract. [Citations.] Because the subcontracts at issue here provided for Stewart's performance, neither Stewart nor his agents can be liable for the tort of interfering with the subcontracts." (*PM Group*, at p. 65.) *PM Group* does not assist either Actelion or the Individual Defendants. Unlike in *PM Group*, Defendants' performance was neither contemplated nor necessary to the License Agreement.

[15] Given our resolution of Actelion's postacquisition argument, we need not consider Actelion's additional argument that, as a matter of law, it cannot be liable for interfering with the License Agreement before the acquisition closed. Actelion argues: "Asahi does not explain how Actelion's alleged pre-[a]cquisition decision could amount to intentional interference with the [License] Agreement but for Actelion's actual post-[a]cquisition termination of CoTherix's development of [F]asudil, which, as just shown, cannot support liability. . . . [S]uch a decision could not cause any harm unless and until it was carried out." (Boldface & italics omitted.)

### 4. *Liability of the Individual Defendants*

The Individual Defendants argue that, even if Actelion is liable for tortious interference with contract, the judgment against them must nonetheless be reversed. They contend: "[T]here is no dispute that the [I]ndividual [D]efendants at all times were acting within the scope of their employment for the benefit of their employer. They are not alleged to have engaged in any ultra vires conduct that interfered with Asahi's contract with CoTherix. Accordingly, regardless of whether the intentional-interference judgment against Actelion is sustainable, the three [I]ndividual [D]efendants cannot be personally liable . . . for an economic tort." (Italics omitted.)

■ It is true that "corporate directors cannot be held vicariously liable for the corporation's torts *in which they do not participate*. . . . '[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct.' [Citation.]" (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 503–504 [229 Cal.Rptr. 456, 723 P.2d 573], italics omitted & added (*Frances T.*).) But "[c]orporate director or officer status [does not] immunize[] a person from personal liability for tortious conduct . . . . [¶] A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts. [Citations.] . . . [¶] The legal fiction of the corporation as an independent entity was never intended to insulate officers and directors from liability for their own tortious conduct. [Citations.] . . . [¶] . . . [¶] All persons who are shown to have participated in an intentional tort are liable for the full amount of the damages suffered. [Citations.]" (*PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1379–1382 [93 Cal.Rptr.2d 663].) "Shareholders, officers, and directors of corporations have [also] been held personally liable for intentional torts when they knew or had reason to know about but failed to put a stop to tortious conduct." (*Id.* at p. 1387.) Here, the Individual Defendants do not dispute their status as "officers" or "directors" of Actelion, and substantial evidence was presented that each actively participated in the tortious conduct.

■ The Individual Defendants also appear to rely on the following statement from *Self-Insurers' Security Fund v. ESIS, Inc.* (1988) 204 Cal.App.3d 1148, 1162 [251 Cal.Rptr. 693]: "[T]wo traditional limits on a corporate officer's personal liability *for negligence* . . . namely, (1) 'the oft-stated disinclination to hold an agent personally liable for economic losses when, in the ordinary course of his duties to his own corporation, the agent incidentally harms the pecuniary interests of a third party' [citation]; and (2)

'the traditional rule that directors are not personally liable to third persons *for negligence* amounting merely to a breach of duty the officer owes to the corporation alone.' [Citation.]" (Italics added, quoting *Frances T., supra*, 42 Cal.3d at p. 505.) But as made clear by the *Frances T.* court, such a rule regarding economic losses relates only to a "corporate officer's or director's personal liability *for negligence.*" (*Frances T.*, at p. 505, italics added.) The Individual Defendants entirely fail to explain what these negligence principles have to do with their liability for an intentional tort.

■ Additionally, the Individual Defendants rely on cases involving the so-called manager's privilege. "[The manager's] privilege has been described by one court this way: 'The privilege to induce an otherwise apparently tortious breach of contract is extended by law to further certain social interests deemed of sufficient importance to merit protection from liability. Thus, a manager or agent may, *with impersonal or disinterested motive,* properly endeavor to protect the interests of his principal by counseling the breach of a contract with a third party which he reasonably believes to be harmful to his employer's best interests.' [Citations.]" (*Aalgaard v. Merchants Nat. Bank, Inc.* (1990) 224 Cal.App.3d 674, 684 [274 Cal.Rptr. 81].) It is also "settled that 'corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract.' [Citation.]" (*Mintz, supra*, 172 Cal.App.4th at p. 1604.) The Individual Defendants contend: "In refusing to recognize that the manager's privilege applied to the [I]ndividual [D]efendants after Actelion acquired CoTherix, the superior court committed an error of law."

These cases do not assist the Individual Defendants because Actelion admitted that "no contract exist[ed]" between it and Asahi and that Actelion "did not assume the contract between [Asahi] and CoTherix." The trial court properly granted Asahi's motion for summary adjudication, concluding that the manager's privilege did not apply to the Individual Defendants because none were managers *of CoTherix* or authorized to act on *CoTherix's* behalf, and none of the Actelion entities are parties to the License Agreement. The Individual Defendants assert that, in granting summary adjudication on the manager's privilege defense, the trial court focused on the wrong question. They contend that, pursuant to their broad reading of *Applied Equipment*, "for purposes of liability for Actelion's post-acquisition termination of CoTherix's development of [F]asudil, the question is whether the individual defendants were managers of Actelion, not whether they were managers of CoTherix." But we have already rejected that broad reading of *Applied Equipment*. And, under the manager's privilege, a company's manager may not be liable to a third party for inducing *his or her* company to breach *its* contract with the third party. (*Klein v. Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 80 [259 Cal.Rptr. 149].) The manager's privilege does not exempt a manager from

liability when he or she tortiously interferes with a contract or relationship between third parties. (*Ibid.*)

B. *Instructional and Evidentiary Issues*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Compensatory Damages*

The jury was instructed that to recover for lost M&R payments which Asahi claimed it would have received under the License Agreement (lost profits), "Asahi must prove it is reasonably certain it would have earned lost [M&R payments] but for the conduct of [Defendants]." The jury awarded Asahi $358.95 million in lost M&R payments. The jury also awarded Asahi $187.4 million in development costs and $75,000 in investigator-sponsored study costs that CoTherix would have incurred for Asahi's benefit to bring Fasudil to market if it had continued to perform under the contract. Asahi accepted the trial court's remittitur that reduced the development costs award to $18.85 million.[25]

Actelion insists that damages are uncertain and speculative, and that the evidence does not support any damage award. Asahi challenges the remittitur on its cross-appeal. We find that the record supports both the jury's verdicts and the trial court's order, and we affirm the compensatory damages awards in their entirety.

1. *Legal Standards*

■ " '[D]amages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.' (*Grupe v. Glick* (1945) 26 Cal.2d 680, 693 [160 P.2d 832].) . . . [¶] Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses. '[W]here the operation of an established business is prevented or interrupted, as by a . . . breach of contract . . . , damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.' ([*Id.*] at p. 692.) '. . . In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions. [Citations.]' (*Berge v. International Harvester Co.* (1983)

---

[*]See footnote, *ante*, page 945.

[25] The jury award of $450,000 in IND/regulatory maintenance costs is not separately challenged here.

142 Cal.App.3d 152, 161–162 [190 Cal.Rptr. 815].) [¶] 'On the other hand, where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But . . . anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' (*Grupe v. Glick, supra*, 26 Cal.2d at pp. 692–693.)" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773–774 [149 Cal.Rptr.3d 614, 288 P.3d 1237] (*Sargon*).)

In *Sargon*, the Supreme Court added a "cautionary note. The lost profit inquiry is always speculative to some degree. Inevitably, there will always be an element of uncertainty. Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have been. Courts must not eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative. A reasonable certainty only is required, not absolute certainty." (*Sargon, supra*, 55 Cal.4th at p. 775.)

We review a lost profits award for substantial evidence. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759–760 [118 Cal.Rptr.3d 531].) " 'While lost profits can be established with the aid of expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises and the like, the underlying requirement for each is " 'a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.' " ' [Citation.]" (*Sargon, supra*, 55 Cal.4th at p. 776.)

### 2. *Evidence of Lost Profits*

Actelion launches two principal lines of attack on the lost profits award: first, it was speculative to assume that oral Fasudil ever would have obtained FDA and EMEA (European Medicines Agency) approval, much less on the timeline projected by CoTherix, and second, it argues it was speculative to determine the price and market share Fasudil would have commanded had it obtained regulatory approval and the timeline on which it would have achieved those results. We address these arguments in turn.

### a. *FDA and EMEA Approval*

As a preliminary note, we observe that the trial evidence on whether oral Fasudil would have obtained FDA and EMEA approval was relevant to two distinct issues at trial. The first was whether it was commercially reasonable

for CoTherix or Actelion to discontinue development of Fasudil in January 2007. The second was whether Asahi could establish lost profits with reasonable certainty. As to the first issue, the only relevant evidence was facts known to Actelion as of January 2007, when it decided to discontinue development of Fasudil; as to the second, the relevant evidence includes all facts known at the time of trial that might prove lost profits damages with reasonable certainty to the jury. We consider here the broader scope of relevant evidence that would support a verdict.

By the time of trial, several reports of scientific studies were available to the jury. These reports included a substantial amount of preclinical data (basic science and animal studies) on three formulations of Fasudil (intravenous Fasudil, ER Fasudil, and immediate release oral Fasudil or IR Fasudil); a clinical study of intravenous Fasudil in Japan; phase I, phase IIa, phase IIb and long-term open-label clinical (human) studies of IR Fasudil; phase I clinical studies of ER Fasudil; and data on two patient populations who had used intravenous Fasudil (15 years of use in Japan to treat subarachnoid hemorrhage patients; approximately one year of off-label use in China to treat 200 PAH patients).

Asahi presented the testimony of several experts who testified that data from the aforementioned studies established to a reasonable certainty that ER Fasudil would have been effective in treating both SA and PAH, would have had an acceptable safety profile, and consequently would have been approved by the FDA and EMEA on CoTherix's projected timeline.[26] The witnesses included experts on SA (Robert Weiss, M.D.), PAH (Zhi-Cheng Jing M.D. & R. James White, M.D.), Rho-kinase (James K. Liao, M.D.), nephrotoxicity (Stuart Linas, M.D.), drug toxicity (Laura Plunkett, Ph.D.), and the FDA and EMEA approval processes (Jing, White, Plunkett, & Michael Tansey, M.D.).

The medical experts testified that Fasudil had been shown to have physical effects that were known to correlate with increased exercise time, an "end-point" required by the FDA before the drug could be approved to treat SA or PAH. Scientific studies of the effects of Fasudil on lung circulation were positive, and treating physicians and leading physicians in the treatment of PAH had expressed enthusiasm about the drug's potential for cardiovascular treatment. The toxicity shown in certain preclinical studies were not a concern because those studies were designed to identify toxicity at high

---

[26] Defendants moved in limine to exclude all opinion that Fasudil would achieve necessary regulatory approvals. The trial court considered and denied the motions except as to Rausser.

Actelion argues Asahi's experts were not qualified to testify regarding regulatory approval by the EMEA. Asahi's counsel, however, specifically elicited testimony by these experts regarding the bases for their opinions on EMEA approval, and Actelion raised no objection. The argument is forfeited. (See *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

doses. Increases in creatinine levels shown in the IR Fasudil studies were not clinically significant except at high doses. Increases in creatinine levels in ER Fasudil studies were not clinically significant and were reversible. Indeed, CoTherix's phase I study of ER Fasudil showed that therapeutically effective doses of Fasudil were well tolerated in healthy volunteers, the China experience showed intravenous Fasudil could successfully treat PAH with no undue side effects, and the long experience of short-term intravenous Fasudil use (up to two weeks) by subarachnoid hemorrhage patients in Japan provided a robust safety record. Particularly because of the severe effects of SA and PAH and the limited efficacy of the SA and PAH drugs that had been approved, the safety concerns were not a likely obstacle to FDA approval and there were no other regulatory "show-stoppers." Other SA and PAH drugs on the market had adverse safety profiles. Moreover, CoTherix's projected time line for regulatory approval was reasonable because there were no significant obstacles to proceeding to a phase III study, CoTherix had a track record in obtaining FDA approval for Ventavis in record time, and the timeline had been developed by two experienced pharmaceutical companies (CoTherix and Asahi).

On the question of regulatory approval, Actelion does not cite contrary testimony by independent experts, but rather relies on the acknowledgement by Asahi's witnesses that FDA approval is unpredictable until a phase III study is done, and the negative opinions by Actelion personnel. It argues that CoTherix had nothing more than a "hope" of regulatory approval. Actelion emphasizes that no phase III trial of ER Fasudil to treat SA or PAH had ever been conducted. It draws attention to numerous statements by CoTherix personnel or Asahi experts that a phase III study is necessary to prove efficacy and safety and there is no guarantee of FDA approval absent such a study. However, the standard of proof for lost profit damages is *reasonable* certainty, not absolute certainty. (*Sargon, supra,* 55 Cal.4th at p. 775.) Actelion notes that only a small percentage of drugs that enter development are ever approved by the FDA, but it ignores Asahi experts' testimony that the probability of approval increases as development proceeds through the phase I, II and III clinical trial process and that oral Fasudil was well along in that process. Donald Santel (former chief exectutive officer of CoTherix) confirmed that the probability of approval "depends on the stage of development that one is in. It becomes more probable as time goes on." Moreover, there was substantial evidence presented to the jury that Actelion acquired CoTherix, and paid a market premium to do so, precisely because Actelion believed that Fasudil would be approved and would become a competitive threat to its existing product, Tracleer.

■ There is no rule prohibiting recovery of lost profits damages simply because regulatory approval is a prerequisite to selling a product. (*SCEcorp v. Superior Court* (1992) 3 Cal.App.4th 673, 678–679 [4 Cal.Rptr.2d 372]; see

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 448–457 [120 Cal.Rptr.3d 797] [lost profits recoverable on hotel/condominium project never built after town, which was party to development agreement, withdrew support despite fact that regulatory approvals were conditions precedent to completion of project].[27])

Actelion argues that Asahi's inability to find a successor licensee for Fasudil demonstrates substantial uncertainty about the medical or commercial viability of the drug. Asahi experts, however, provided credible alternative explanations for that outcome: Actelion's abandonment of the drug had a chilling effect on competitors because it implied that Actelion had undisclosed knowledge of flaws in the drug, and time lost in obtaining a new licensee reduced the value of the drug, which depended on commercial exploitation during the life of the underlying patents and a unique window of opportunity in 2006 and 2007.

It is for the jury to determine the probabilities as to whether damages are reasonably certain to occur in any particular case. (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97 [67 Cal.Rptr.3d 100].) Substantial evidence, including competent expert testimony, supported the jury's finding that, if CoTherix had continued developing Fasudil, there was a reasonable certainty ER Fasudil would have obtained FDA and EMEA approval to treat SA and PAH on the timeline projected by CoTherix.

### b. *Price, Market Share, and the CoTherix Timeline*

Having determined there was sufficient evidence of the *fact* of lost profit damages, we turn to the reliability of Asahi's evidence regarding the projected price and market share of Fasudil, which set the *amount* of damages. " 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the

[27] At least one federal trial court, applying California law, has found lost profits were recoverable in a pharmaceutical case despite the noncertainty of FDA approval. (*Onyx Pharmaceuticals, Inc. v. Bayer Corp.* (N.D.Cal., May 10, 2011, No. C 09-2145 MHP) 2011 WL 7905185 [under Cal. law, fact finder could find profits reasonably certain based on expert evidence there was an 80 percent chance of approval to treat at least one condition].) Pharmaceutical cases in which courts have held to the contrary are distinguishable on their facts. (*AlphaMed Pharmaceuticals v. Arriva Pharmaceuticals, Inc.* (S.D.Fla. 2006) 432 F.Supp.2d 1319, 1339–1340, 1346–1352 [applying reasonable certainty standard and listing multiple assumptions underlying lost profits claim that were either proved false by trial evidence or were unsupported by evidence]; *Microbix Biosystems, Inc. v. Biowhittaker, Inc.* (D.Md. 2000) 172 F.Supp.2d 680, 698–699 [applying reasonable certainty standard and reversing award where new business would have had to achieve several new milestones before intervening events prevented business's success].)

damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.' [Citation.]' " (*Sargon, supra,* 55 Cal.4th at pp. 774–775; see *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 883–884 [116 Cal.Rptr.2d 158]; *AlphaMed Pharmaceuticals v. Arriva Pharmaceuticals, Inc., supra,* 432 F.Supp.2d at p. 1342 [discussing *Story Parchment Co. v. Paterson* (1931) 282 U.S. 555, 563 [75 L.Ed. 544, 51 S.Ct. 248]].) "If lost profits can be estimated with reasonable certainty, a court may not deny recovery merely because one cannot determine precisely what they would have been." (*Sargon, supra,* 55 Cal.4th at p. 779.)

In September 2006, CoTherix prepared revenue projections for Fasudil through 2019 for the purpose of negotiating its sale price with Actelion. Actelion dismisses these projections as "guesswork" without foundation and contends that Rausser's lost profits calculations are "fatally defective because Rausser essentially adopted rosy projections prepared by CoTherix employees who were not proven to be qualified to create reliable forecasts." But the evidence presented showed that the projections were based in part on CoTherix's findings during its internal due diligence process, which included consultation with experts, before it signed the License Agreement with Asahi, and on market surveys that were conducted before Actelion expressed interest in buying CoTherix.[28] The September 2006 projections estimated product launch dates (which were consistent with the projected regulatory approval timeline), an initial price for ER Fasudil, annual price increases, numbers of patients in target populations for both conditions with annual increases, initial market penetration into those populations with annual increases, and resulting net revenues.[29] On at least one measure (size of the targeted SA population),

---

[28] We do not agree with Asahi's argument on appeal, or the testimony of Asahi's economic expert Rausser at trial, that substantial evidence shows Actelion adopted or relied on CoTherix's September 2006 projections while negotiating its acquisition of the company. Although Actelion sent the CoTherix projections to its advisers, Lehman Brothers, and reviewed them at its board meeting on the proposed acquisition, Lehman Brothers disclaimed any independent verification of the figures and the board presentation itself demonstrates that, in contrast to CoTherix's projections, Actelion projected zero revenue from Fasudil as a result of the acquisition. However, there was testimony that the 70 percent premium Actelion paid for CoTherix could be explained by the value of keeping Fasudil off the market, particularly in light of negative information about Ventavis that was disclosed during Actelion's due diligence process.

[29] CoTherix projected a price of $5,000 per patient per year for both SA and PAH in 2006 with 5 percent annual price increases; a targeted SA population (refractory SA patients) of 929,000 in 2011, rising to 986,000 in 2017; market penetration in this SA population of 2 percent in 2011, rising fairly steadily to 8 percent in 2015 and holding at 8 percent through 2017; a PAH population of 24,000 patients in 2011, rising to 32,000 in 2017; and PAH market

the projections were more conservative than CoTherix's commercial assessment of Fasudil before it entered into the License Agreement. Rausser testified that he reviewed academic literature on market dynamics, industry data on drug sales, and the discovery record of the instant action, and confirmed that each element of the CoTherix projections was reasonable if not too conservative. Asahi's medical experts also generally corroborated the market penetration and price projections.

Actelion seeks to compare the CoTherix projections to those found to be too speculative in *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281 [61 Cal.Rptr.3d 243] (*Parlour*). We are not persuaded. The *Parlour* projections were prepared to attract investment for a new business, they included broad disclaimers, and the witness who presented the projections at trial did not know who prepared the projections or what methodology they had used. (*Id.* at pp. 289–290.) Here, although the CoTherix projections were prepared during negotiations for sale of the company, CoTherix had already demonstrated its genuine belief in the commercial potential of the product by entering into the License Agreement and making a substantial commitment of its own resources (approximately $187.4 million) to develop and market the drug. CoTherix's former chief executive officer, Santel, testified that the projections were prepared based on the best efforts of his experienced staff and represented the company's best opinion (the middle of three cases) of future revenue. Moreover, Rausser testified that he independently verified the market assumptions underlying the projections and Asahi medical expert testimony supported the market share projections at least in part.

Actelion argues the "range" of lost profit estimates provided by Rausser itself indicates that the estimates were unreasonably speculative. However, Rausser provided two distinct estimates rather than a range and he specified the different assumptions on which they were based, described the facts he relied on to make the different assumptions, and explained precisely how the two figures were calculated. In these circumstances, the mere spread of the two numbers does not render his opinion speculative.

Actelion contends that Rausser's projected price for Fasudil of $5,000 per patient per year is "utterly fanciful." Actelion contends the price projection was unrealistic because Rausser conceded that Fasudil would sell for the same price in the SA and PAH markets and that competing SA drugs sell for as little as pennies a day. However, the specific SA population targeted by

penetration of 4 percent in 2012, rising to 30 percent in 2017. These projections, which were the middle case of three projected scenarios, resulted in net revenue in the SA market of $86 million in 2011, rising to $695 million by 2017, and net revenue in the PAH market of $5 million in 2012 that rises to $78 million by 2017.

CoTherix consisted of patients who had not responded to existing therapies or had other complications, so the price of other SA drugs would not necessarily keep Fasudil out of this particular niche of the SA market. Actelion does not contest the evidence that competing PAH drugs were selling for far more than $5,000 per patient per year, which supports the view that CoTherix could command such a price in the PAH market, where the penetration level was projected to be about quadruple that of the targeted SA market. Actelion also ignores the fact that its own PAH product, Tracleer, commanded a price almost seven times as high as the projected price of Fasudil (approximately $34,000/year in 2006 and over $43,000 in 2008).

Actelion characterizes this case as a "new business" case and argues there is insufficient evidence of prior performance by CoTherix selling Fasudil or by similar businesses selling a similar product to support the lost profit damages. But this case does not fit neatly into the established business versus new business paradigm. Unlike the company at issue in *Sargon*, CoTherix had a track record of obtaining FDA approval for and marketing a PAH drug (Ventavis) and had a sales and marketing team already in place. (Cf. *Sargon, supra*, 55 Cal.4th at pp. 778–780.) Rausser verified the CoTherix projections by reviewing the pharmaceutical market specifically for SA and PAH drugs. Actelion's suggestion that the only adequate comparison would be to a company already selling Fasudil is an overreach: the case law requires reasonable certainty, not absolute certainty, and once the occurrence of lost profits is established a plaintiff has greater leeway in establishing the extent of lost profits, particularly if the defendant was shown to have prevented the relevant data from being collected through its wrongful behavior. (See *Sargon, supra*, 55 Cal.4th at p. 775.)

Actelion also attacks the reliability of Rausser's expert opinion generally, including reference to instances in which a federal trial court has found his testimony flawed or unpersuasive.[30] Our concern, however, is with the testimony given by Rausser in this case. Actelion does not challenge Rausser's extensive qualifications as an expert in economics. As in *Sargon*, the trial court "presided over a lengthy evidentiary hearing and provided a detailed ruling." (*Sargon, supra*, 55 Cal.4th at p. 776.) The court heard testimony from Rausser in an Evidence Code section 402 hearing over two days, on January 13 and 19, 2011, in response to an Actelion motion in limine. The trial court issued a detailed order granting the motion in part, and set the parameters of the testimony Rausser would be permitted to give. Rausser testified within those parameters. Unlike *Sargon*, this is not a situation in which the trial court's gatekeeper role required exclusion of speculative expert testimony. We have reviewed Rausser's testimony and find nothing that would have required the trial court, or the jury, to reject his conclusions,

---

[30] Asahi responds with citation to federal trial court cases reaching contrary conclusions.

or that would require us to do so. In sum, we conclude the lost profits award is supported by substantial evidence.

3., 4.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. DISPOSITION

The judgments are affirmed. Asahi shall recover its costs on appeal.

Jones, P. J., and Needham, J., concurred.

Petitions for a rehearing were denied January 16, 2014, and the opinion was modified to read as printed above. The petition of appellants Jean-Paul Clozel, Martine Clozel and Simon Buckingham for review by the Supreme Court was denied March 12, 2014, S216123.

---

*See footnote, *ante*, page 945.